Mr. Sussman, you have reserved two minutes for rebuttal. Is that correct? Yes, Your Honor. Can you hear me? We can. Thank you so very much. Thank you for your accommodation. I very much appreciate it. Oh, no. We're glad that we're able to see you. So, please proceed. Yes, Your Honors. This case is a putative class action which is brought by social workers in New York State, attempting to represent a class of social workers who have gone through all of the educational training and supervision required to become social workers, but are unable to become social workers because of the operation of a series of tests given by the American Social Work Board, which tests are required by the licensing agency here in New York and more broadly in 37 states, and which have had a profoundly racially disparate effect. So, can I ask which version of the interference theory you think is still viable in our circuit? There's some whispers and some differences across the circuits. It's a very good question, and I guess I have to start from my own understanding of what interference might mean in this situation, because the cases are sort of all over the place in some way. We have a core employment function, and we understand that assessing qualifying individuals for employment in a field is that function. Is it? Has any circuit ruled that that is true? I believe the Ninth Circuit squarely ruled that, and I think that there's a great deal of effort in the Galeno case to try to distinguish what the Ninth Circuit did. But I think, yes, it did. We're bound by Galeno, right? Well, you're bound by Galeno if Galeno reached the issue. And the question is, if you study Galeno, and I'm sure you all have with great care, at page 21 of 31 of the opinion, what they say in Galeno is that there are other interests that distinguish Galeno from an interference case. And those interests are that the state of New York, the way they view the state of New York's role in Galeno, I'm not sure this is accurate under Bianco's arguments, but let's just assume it's accurate for a moment, that the state has this traditional role with respect to education, and that role with respect to education must respect, even though the imposition of last might arguably be seen as not respecting, the locality's critical role with regard to employment. The Galeno court says that we can't adopt this kind of theory, given the interests of federalism and Title VII is not intended to douse those interests. I don't think this case has any resemblance to Galeno, and I'll tell you why. Here, the various agencies were not imposed upon by the state of New York and told by the state of New York, you must use the last test. Here they went out and they delegated a key employment function, which is this filtering who is qualified to do the work. They themselves delegated that intentionally to an entity, the American Social Work Board, which by then they had reason to know, according to the complaint, were using instruments that have very significant racially disparate aspects. And I believe that, sorry. Go ahead. I want to make sure you get in. So Galeno declined to treat professional licensing or administration of a licensing exam as delegation of a core employer responsibility. In the context that it dealt with, and I think the context it dealt with, as the Court says, they don't find justification for the use of the interference test in the context presented. But I think the context presented is very distinct. The context presented here, as I've said, is an absolutely intentional, non-adventitious or circumstantial adoption by these boards of this test. They did not have to do that. They went out and did that based upon their own decision making. That's not what happened in Galeno. In Galeno you had New York State, which had this plenary responsibility for education, yet didn't control school districts imposing this exam. So why don't you tell me, one of the things that I'm struggling with is how we can find that the plaintiff's employers delegated anything. I mean, because the requirement to take the state exams come from state-imposed licensure requirements. So how is it a delegation of core employment functions when it is a requirement by the state and not the people who employed the plaintiffs? They all have jobs and they didn't pass. That's a great question. There is a double attenuation here, which I don't think occurs in other cases. But I don't think the double attenuation really detracts from the argument in terms of what the role of ASWB is. And that's the focus here. What happens here is there is definitely, as your question rightly points out, a double delegation. The delegation is, one, from the state. The state takes these exams and utilizes them as a gatekeeper. And obviously, secondly, various employers down by the state, which they are, and state licensing requirements must then, not by the benefit of employment opportunities, to the individuals who are detrimentally affected by the exam. So that's that. Can I just ask, doesn't this double, what you're calling double delegation, take us out of the Ninth Circuit's AME case? Because there, there was a determination that the state had a really important amount of control over the schools. But here, the state has a, without being sarcastic, it has a really important amount of controls over the employees. It has this positive control over the employees because the employees may not violate the state and must abide by its restriction. So I don't see that as distinguishing this conceptually. It does add a layer. I'm not disagreeing with the Court on that. But the layer seems to me insignificant with respect to the legal purposes of Title VII, which are to extricate this kind of, I think, the way I understand it. If one doesn't understand Title VII this way, I think there's a tremendous gap that's being created because so many individuals are adversely affected, not by the decisions taken spontaneously by their employers. Their employers don't have any choice. They don't have any choice because of the operation of this system. The other argument I want to briefly touch on, and I know there are three issues in the case and time is limited, I think the 1981 argument here is particularly vulnerable because I think that the tests that were set in Burgess' case are plainly met by the statistical information we have provided. And the Rutgers studies only examined the LCSW exam and not the LMSM exam. Is that right? Correct. Correct on that. But there's no reason to believe there's any difference because the data that's been provided by the entity in its August of 22 revelation after many years of the same racial disparities exist with regard to both sets of exams. Given the Burgess requirement that when you're trying to establish an intentional discrimination claim based on statistical disparities that they have to be severe, how do we bridge the gap when you don't actually even have any statistical exams or research on one of them? Like, you're asking us to assume that they're the same, but your burden under Well, there's a severe statistical disparity with regard to one. There's the same, just to be clear, there's the same severe statistical disparity with regard to the other. What doesn't exist with regard to the other is the regression analysis. Because as you mentioned correctly, Rutgers didn't address that. But it seems to me at a pleading stage, we're all reasonable inferences that it And you have the same stark discrepancy in both sets of results. It would be very logical to assume at this stage in the litigation, remember, we're in a motion to dismiss, that we've met our burden of getting to this Does that mean that you don't read Burgess to establish a requirement of severity at the pleading stage? I believe that we've established severity at the pleading stage. The question for both. Because the gross statistical data is the same, roughly the same. What I'm saying is Sorry, the same as what? It's not the same as in Burgess. Burgess showed a two to three standard deviation delta, correct? Yes. There's approximately a 30 to 40 percent difference in success rate. And under the regression analysis, that's been demonstrated to be five times likely, with regard to one exam, to derive from race and race alone and not from the various factors that were weeded out in the regression analysis. And all I'm arguing is that it's logical to think the very same would apply to the other. I'm sorry, we've got one more question from Judge Kasdan. What is your best support for the argument that race was a but-for cause of the alleged injury, namely loss of employment opportunities? Well, the best argument is that we have evidence that a study was conducted after years of demonstration, which was not permitted, if you will, that demonstration by ASWBBs. They wouldn't make the data available. Finally, they made the data available. The data shows stark racial disparity. One study shows that that very significantly is related to race, in a manner which I think meets Burgess. And I argue that from a prima facie point of view, on a pleading, that should be taken most favorably to the plaintiff, assumed to be true for the other test. Thank you. We'll hear from you, Your Honor. Thank you, Your Honors. May it please the Court. Jennifer Simcoe here on behalf of Defendant Appellee's Association of Social Work Boards. Your Honors, I think you touched on a number of key points, and this case is fairly straightforward. The trial court properly dismissed all three categories of the plaintiff's claims because they simply don't fit the circumstances here. With respect to Title VII, that is an employment discrimination statute. ASWB is simply not an employer here. Do you think any version of third-party interference survives in this circuit post-Galeno? Potentially no version survives. It's clear that this court in Galeno was very critical of the Sibley third-party interference test. It did not squarely address whether it survives at all. But to the extent it does survive, at best it survives in the form that the Spurt decision set forth, which requires, as Your Honors were just discussing, delegation of a core employment responsibility. And that simply does not exist here. No employer or potential employer of these plaintiffs has delegated any responsibility to ASWB. Counsel says it's a double delegation. Even worse, there's no authority that plaintiffs' counsel have cited that suggests double delegation is a thing or is recognized in this circuit. Here you've got a nonprofit. Can you say that any circuit as well? Even the ones that have a more expansive and favorable view of the interference theory than ours? No, Your Honor. I'm not aware of any circuit that has recognized a double delegation of a core responsibility theory. Here we've got multiple layers before you get to ASWB, and ASWB, as we point out in our briefs, has no familiarity with the plaintiff's purported employers or potential future employers. There's simply no delegation at all happening here. So I've got a question about the 1981 claim. We have two different metrics here, passage rate and actual test scores, and they seem to tell different stories. What is your best argument for why the appropriate statistical disparity we should look at is test scores as opposed to passage rates? Well, at the end of the day, Your Honor, what this Court really has to consider is what we're told by Burgess, that the stats have to be so profound, so significant, that it makes all other nondiscriminatory explanations very unlikely. Why is the extreme disparities in the passage rate not meeting the Burgess test? Maybe I should have asked it that way. Because they're simply not extreme enough to rise to that very high level of intentional discrimination. Remember, Section 1981 is not about disparate impact. It's about the defendant allegedly – I'm sorry. So you don't think that the difference in passage rate is extreme enough for us to consider? Correct, Your Honor. Burgess tells us we need two or three standard deviations. For African-American test takers, it's about one standard deviation, and for Hispanic test takers, it's even less than that. And as the Rutgers report points out, there are plenty of nondiscriminatory reasons why those test scores may come out the way that they do. Judges aren't statisticians, and statistical models are constantly being explored and examined. Is there a reason why standard deviation has to be the measure by which we look to see if statistical differences are probative of circumstantial evidence of discriminatory intent? Sure. Not being a statistician myself, either. The good thing about standard deviations is it cuts out all of the noise. I know plaintiffs' counsel in their briefs, you know, it's five times more – But standard deviation will change depending on population size and sample size. Like, it's a – I'm asking if we have any room, in your view, to examine the appropriateness of using standard deviation as the only measure for an extreme disparity. Well, this panel can't depart from the guidance of Burgess, but I would – Right, so we know that Burgess stands for the fact that there needs to be a profound statistical disparity. Do we have to use standard deviation as that measure? Especially – I mean, does that mean we are frozen in time with our statistical knowledge about – And, again, standard deviation changes depending on the population size that you're looking at. Sure. I think Burgess tells us that standard deviation is, in that panel's view, the best metric to consider. But at the end of the day, again, the question is, do the stats – Are they so profound that they make nondiscriminatory explanations very unlikely? And if you read the Rutgers report, it is full of nondiscriminatory explanations for the data that we see. The school that a student went to, the community they come from, the nature of their upbringing, their socioeconomic status. The Rutgers report does the exact opposite of what Burgess requires. The authors identify a wide variety of nondiscriminatory reasons and point to additional data that could be studied that would even more narrow the gap between the various groups of test takers. So you are asking us to find, as a matter of law, that a difference of five times is not severe enough to rely, at least at the pleading stage, as evidence of – at least circumstantial evidence of discriminatory intent? Yes, Your Honor, because the plaintiffs have relied on the Rutgers report, you need to and can take into account the report as a whole. And as the authors made clear, when you start to take into account other factors, that five times figure becomes less and less and less significant. For Hispanic test takers, in fact, I would offer that the Rutgers report shows that Hispanic test takers on average scored 2, 3, 4. But that's why I asked the original question. Like, it seems to me this comes at least part down to what is the most appropriate metric. Is it the test scores or is it the passage rates? And I started off by asking you, why is it the test scores as opposed to the passage rates? Because one could certainly imagine somebody picking a number on the test score that put some people over it and some people under it. Mm-hmm. So why is it scores as opposed to passage rates? Because that is a fair statistical measure of comparing candidates. And, again, not to sound like a broken record, Your Honor, the Rutgers report makes clear that when we really parse that data, it does not suggest that the exams are biased. But is parsing inconsistent with the pleading standard? I mean, you're asking us to rely on – you're saying that the statistics need to be big, right? And I think Burgess stands for that. Why is it five times big enough? Because, Your Honor, Burgess is telling us the statistics need to be big because they must be so profound that they exclude nondiscriminatory reasons for the data we're seeing. Let me put it another way. What is the plausible nondiscriminatory reason for picking a number as a passage rate that leads to a five-times disparity? Well, the plausible nondiscriminatory reasons actually relate to the disparate impact question as opposed to picking a specific number. And in that sense, what the authors of the report are telling us is that they looked at and considered the various reasons why we might see these differences, the five times, the one standard deviation, the less than one standard deviation. And their viewpoint is that there are a number of explanations that have nothing to do with race. What do we make about the allegation that he refused to validate the exam? Your Honor, I'm glad you raised that. Or that it took a long time to release the data. Sure. I think Comcast makes clear that even if a defendant is aware of the disparate impact of its activity and makes no change, that does not rise to the but-for test that Comcast set out. I'm sorry, so you're asking us to find that if we could conclusively establish, conclusively establish that a number was picked that had a huge discrepancy, you would say that that means that ASWB is now not responsible for probing and examining why those disparities exist? Under a 1981 theory, yes, Your Honor, that is not sufficient, Comcast tells us. And the choosing of the passing score, certainly there is no factual allegation suggesting that that pass, that cut score, that number was chosen for discriminatory reasons. There are allegations that it had a discriminatory impact. No, but that's the whole point of the statistics, is that they're supposed to be circumstantial evidence of discrimination when someone doesn't have smoking gun evidence. That's why the statistics need to be big enough to be probative. And so big that they rule out all non-discriminatory explanations. And so I'm asking what is, if I disagree with you, that I think a five-time disparity is significant enough, what is the non-discriminatory explanation provided for that statistic? The Rutgers report is full of the potential non-discriminatory explanations. Undergraduate performance, undergraduate institution, socioeconomic background, the number of years a student waited between completing school and taking the test, the type of clinical work experience they had before taking the test. The authors point out all of these as factors that could explain that five-times disparity and have nothing to do with race or ethnic background. Can I ask one question just going back to the regression analysis? So just so that I understand this, it's your view, is it your view that while the judge may have erred in the regression analysis in not addressing the disparity of the pass rates? I'm sorry, Your Honor. The judge may not have erred? Is that what you're? Did the judge err in the regression analysis? No, Your Honor. In terms of the bottom line, you agree with the judge's analysis. But the district court considered only the difference in exam scores between racial groups rather than the disparity in pass rates, right? Was that error? Maybe you're saying it's harmless error. I don't agree. I don't believe that it was error, Your Honor. And if it were an error, it is harmless. Again, the question is, are there non-discriminatory explanations? Were these statistics so overwhelmingly stark that they rule out the possibility or make it very unlikely that there are non-discriminatory explanations? And plaintiffs can't, on the one hand, rely on the Rutgers report for particular aspects and completely ignore the overall message of the authors of that report, which is that based on their analysis, there are a number of non-discriminatory explanations for the data that we see. Thank you. Mr. Sussman, you've got two minutes. In testing litigation, the burden once a racially disparate showing is made, which it plainly is made here with regard to the pass rates, the burden shifts, in my view, to the defendant to demonstrate that the test has been validated and that under Griggs that is the least discriminatory way of engaging in selection. None of that's happened here whatsoever. If you look carefully, as I know you've done, at the Burgess case, what the Burgess case says is to show discriminatory intent to reprotection case based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be to a level, of a level that makes other plausible non-discriminatory explanations very unlikely. So what would you respond to her argument that there are some plausible non-discriminatory explanations for the difference? I would say that on a motion to dismiss, those should be disregarded because it is not demonstrated that the huge disparity in pass rates relates to those and that would ultimately be their burden. They can't meet their burden by the Rutgers test. The Rutgers study itself points out nothing definitive. This becomes a bit circular because you're saying that you want to survive the pleading stage with circumstantial evidence of intentional discrimination through the use of statistics that need to be done so severe that there's no plausible alternative, but then you want to say that they need fact-finding or something in order to show that their plausible alternatives doesn't settle the case? I mean, how do they both exist? I don't think, how do they both exist under Burgess? How can both of those positions be true? They both exist because the statistical significant data is sufficient under Burgess. It is stark, and it has not been explained. Counsel gets up and says there may be explanations from this, that, and the other, but there's no such thing. I'm sorry. So you don't read Burgess permitting statistics when it is so severe that all other non-discriminatory explanations are very unlikely? That's not your reading of Burgess? That is what it says. I just read that, and that is what it says. Okay, but that's the case. Where does them coming up with alternate explanations come in? Are you saying that it cannot come in or cannot be decided or determined at the pleading stage or it needs to be done later? It cannot be determined at a pleading stage where there are other factors which, in my view, would lead a court to believe there was intentional discrimination. And so that's the absence of things like the failure to get it validated, right, and the failure to release it? Exactly. And a consciousness of guilt, if you will, that this was a test which had over time and was being seen as having over time profound impacts on the profession, which relates, by the way, to the pass rate, not to some scoring. It relates to how many people get through. The number of people who get through is the relevant factor here in terms of these employment opportunities. Okay. Thank you. Thank you so much. We are over time. We appreciate it. We'll take your case under advisement.